United States District Court

For the Northern District of California

1
2
3
4
5                          UNITED STATES DISTRICT COURT

6                          NORTHERN DISTRICT OF CALIFORNIA

7

8   GERI MARIDON,                              No. C-12-2109 EMC

9              Plaintiff,

10        v.                                   **ORDER GRANTING IN PART AND
                                               DENYING IN PART DEFENDANT'S
11  COMCAST CABLE COMMUNICATIONS               MOTION FOR PARTIAL SUMMARY
    MANAGEMENT, LLC,                           JUDGMENT**

12             Defendant.                      **(Docket No. 26)**

13  _____/

14

15

16                          I.    **INTRODUCTION**

17        Pending before the Court is Defendant's motion for partial summary judgment.  Docket No.

18  26.  In this suit under California's Fair Employment and Housing Act, Plaintiff alleges various acts

19  of sex and sexual orientation discrimination and harassment in the workplace dating back to 2005

20  and before.  Prior to filing suit, Plaintiff filed an administrative complaint against Defendant for

21  discrimination with the Equal Employment Opportunity Commission on June 3, 2011.  This

22  complaint was amended on November 30, 2011 to include allegations of harassment.  Plaintiff

23  thereafter filed this suit in Santa Clara County Superior Court.  Defendant removed the case to

24  federal court on April 27, 2012.  Docket No. 1.  Defendant now brings this motion for partial

25  summary judgment arguing that Plaintiff's claims are partially barred by the statute of limitations as

26  to incidents that took place more than one year prior to the relevant EEOC claim.  Plaintiff opposes

27  the motion, relying on the continuing violation doctrine.

28

**United States District Court**
For the Northern District of California

## II.    FACTUAL & PROCEDURAL BACKGROUND

On this motion for summary judgment, the following facts are undisputed.[1]  Plaintiff, who is a lesbian woman, began working for Defendant Comcast in August 2001.  Declaration of Geri Maridon ("Maridon Decl.") ¶ 3 (Docket No. 31-1).  During the entire course of her employment for Defendant, she has worked as a technician (also known within the company as a "comm tech") out of the San Jose Field Fulfillment Office ("FFO").  *Id.*  Plaintiff's current position is as a Comm Tech 3B.  *Id.* ¶ 4.  The majority of her duties involve performing cable, telephone, and internet installations, service, and repair at individual residences and multiunit dwellings.  *Id.*

In 2007 Plaintiff performed modified work outside of her department for two months.  Maridon Depo. at 38.  She was again worked on modified duty from July 2008 to April 2009, and then took a leave of absence due to a workplace injury from July 2009 to August 2010.  *Id.* at 37-38.

A.    Workplace Environment

Defendant's field operations employees at the San Jose FFO have been overwhelmingly men during the entire time Plaintiff has worked there.  Maridon Decl. ¶ 5.  Currently, she is the only woman employed at the FFO in field operations; of the approximately 100 technicians, 9 supervisors, and 2 managers, everyone other than Plaintiff is male.  *Id.*  During Plaintiff's employment at the San Jose FFO, there has never been a female technician, supervisor, or manager at that site.  *Id.*  Plaintiff also offers additional statistical evidence on Defendant's lack of female

---

[1] On December 21, 2012, this Court directed the parties to focus their discovery on incidents within the limitations period until this motion could be heard.  Docket No. 24 at 13-14.  Though Plaintiff did not object at the time of the case management conference, Plaintiff now argues that this limitation on discovery has hampered her ability to respond to this motion and thus violated her due process rights.  Pl.'s Opp. at 10-11.  Plaintiff offers no law on this point, nor does she explain what discovery she would have taken to prepare for the motion had she had the opportunity.  *Id.*  Nevertheless, she requests that if this Court is inclined to grant Defendant's motion, that the Court stay the ruling to permit Plaintiff to conduct additional discovery.

As discussed below, the Court's ruling on this motion turns on the finding that both the discrimination and harassment claims had reached a level of permanence that precludes application of the continuing violations doctrine.  As this inquiry focuses on whether a reasonable employee would have been aware that the employer was not going to remedy the objectionable conditions, the relevant evidence – what Plaintiff saw, heard, and knew during the relevant time period – is already in her possession.  This Court thus finds that Plaintiff was not hampered in her ability to oppose this motion by this Court's earlier ruling limiting the scope of discovery.

**United States District Court**
For the Northern District of California

1  employees, though Defendant contests the completeness and significance of those statistics.  Pl.'s

2  Opp. at 1-3.

3      Plaintiff describes the work environment a being "a very male dominated 'locker room' type

4  environment."  Maridon Decl. ¶ 6.  Both technicians and supervisors curse frequently, and often

5  make rude and vulgar remarks, including telling each other to "suck my dick" and calling each other

6  "fags."  *Id.*  There is an area of the San Jose FFO that is reserved for supervisor's offices, known

7  among employees as "supervisor row."  Maridon Decl. ¶ 8.  Throughout her time working for

8  Defendant, Plaintiff has often heard supervisors, talking either amongst themselves or with

9  technicians, "speaking in a macho way, meaning talking about sports, drinking, poker, and other

10  things that men generally prefer to do in their off-work time."  *Id.*  On several occasions, when she

11  returned to the FFO during the day, she has observed supervisors throwing a football around their

12  area and playing ping-pong with the managers.  Maridon Decl. ¶ 9.

13      Though Plaintiff states that she cannot recall the details of every workplace incident that

14  made her feel singled out as a woman, she offers a number of examples that have occurred over the

15  years of her employment with Defendant.  Maridon Decl. ¶ 10.

16      On one occasion, Defendant brought in an outside trainer, who happened to be an attractive

17  woman.  Maridon Decl. ¶ 11; Deposition of Geri Maridon ("Maridon Depo."), at 227-28 (Docket

18  Nos. 28-1, 31-3).  Many of the technicians made cat calls and inappropriate comments.  *Id.*  Human

19  Resources Director Pam Aldridge witnessed this event, and Plaintiff was told that Aldridge

20  subsequently required sexual harassment training for some employees.  Maridon Depo. at 229.

21      At one point Mr. Alfredo, a technician in the San Jose FFO was in the supervisor row area

22  talking about a woman with whom he had had a sexual encounter over the weekend.  Maridon Decl.

23  ¶ 12.  Plaintiff asked him to take the conversation outside, and he responded "I'm not talking to you

24  and I'll continue saying whatever I want to."  *Id.*  Plaintiff told him that she found the conversation

25  highly inappropriate, but she left the room because she did not believe that he would stop his

26  discussion.  *Id.*

27      At one point in late 2008 or early 2009, Plaintiff walked past a room where supervisor

28  Francisco Soto who was talking to supervisor Joe Foster and some other supervisors.  Maridon Decl.

¶ 13.  When they saw her, the group stopped talking, and Soto told her that she needed to wear a cowbell around her neck when she entered the area.  *Id.*

In March 2009, Plaintiff was in a training course being taught by Scott Woodward.  Maridon Decl. ¶ 14; Maridon Depo. at 222-23.  During the class, he was demonstrating a technique with diagonal cutters, which are sometimes referred to as "dikes."  Maridon Depo. at 222-23; *see* http://en.wikipedia.org/wiki/Diagonal_pliers.  Woodward asked Plaintiff if she minded if he called the tool "dikes."  Maridon Decl. ¶ 14; Maridon Depo. at 222-23.  She thought to herself, "why are you asking me that?", but told him to call the tool whatever he wanted.  Maridon Depo. at 223.  She never reported the incident to management or human resources.  *Id.*

Sometime in 2008 or 2009, Plaintiff was working at a desk in an open area of supervisor row, and supervisor Izaias Ballesteros was speaking to technician David Nijar in his office.  Maridon Decl. ¶ 15; Maridon Depo. at 93-94, 126-27.  Ballesteros commented to Nijar that he did not want to go out that night because he did not want to go home smelling of "pussy juice."  Maridon Decl. ¶ 15; Maridon Depo. at 93-94, 126-27.

During this time, Plaintiff would occasionally complain to human resources manager Pamela Aldridge about her perceptions of male bias in the workplace.  Declaration of Marianne C. Koepf ("Koepf Decl.") Ex. B at 13 of 23 (Docket No. 28-2).  Plaintiff estimates that she spoke to Aldridge a total of 8-10 times at various points.  *Id.*  Aldridge stopped working for Comcast in October 2008, indicating that these conversations may have been before that time.  Declaration of Carol Norwood ("Norwood Decl.") ¶ 7 (Docket No. 29).

In September and October of 2010, Plaintiff and approximately 8 other technicians took a class with instructor Scott Woodward that would allow her to advance to the "Comm Tech 4" classification.  Maridon Decl. ¶ 16; Maridon Depo. at 225-26.  At one point during a class, Woodward stated that he had a joke that he would have told, but that he did not because they were in "mixed company."  Maridon Decl. ¶ 16; Maridon Depo. at 225-26.

At morning technician meetings, the group is often addressed collectively as "guys."  Maridon Decl. ¶ 17.  On one occasion, Don Carter greeted the group as "gentlemen" and then added "oh, and Geri."  *Id.*; Maridon Depo. at 55-56.  She spoke to Carter about the incident, but he did not

**United States District Court**
For the Northern District of California

respond.  Maridon Depo. at 56-58.  She also spoke to Matt Silvey about the incident, telling him that she felt Carter's remarks had been disrespectful.  *Id.* at 57-59.  Silvey said that he would speak to Carter.  *Id.*  On another occasion at a technician meeting, Francisco Soto stated that the group was not there to "have a pissing contest, we're here to get work done."  Maridon Decl. ¶ 18; Maridon Depo. at 94 to 95.

On one occasion, manager Pete Hill stated that he was looking to hire five "guys" for the business services department.  Maridon Decl. ¶ 19.  Plaintiff asked if she would be able to apply, since she was a woman.  *Id.*; Maridon Depo. at 287.  She later spoke to Eric West about the incident.  Maridon Depo. at 287.

At some point in 2011, technician Leonard Barnes was talking about a female Comcast customer's breasts in front of supervisor Brent Sosa.  Maridon Decl. ¶ 20.  Sosa said nothing until Plaintiff looked at him and said "really?"; at this point he said "okay guys, I need you to quiet down."  *Id.*  Plaintiff complained about Sosa's failure to intervene earlier to Matt Silvey, who said he would look into the matter.  Maridon Depo. at 136-37.

Until January 2012, Defendant had not had a female vice president in field operations at the San Jose FFO.  Maridon Decl. ¶ 21.  On January 10, 2012, Defendant hired Amy Lynch as a regional vice president.  Maridon Decl. ¶ 21.  About two weeks after Lynch was hired, a male technician told Plaintiff that the technicians needed to get together and intimidate Lynch so the technicians can get what they want.  *Id.* ¶ 22.  Plaintiff has also heard other technicians state that they will have to "see what a woman can do" and have questioned what Lynch knows about the work of technicians.  *Id.*

On February 8, 2012, Plaintiff was present at a technician meeting where employees were learning stretches to use in the field before performing strenuous activities.  Maridon Decl. ¶ 23.  One stretch involved rotating the hips in a circular motion, and many male technicians made comments and gestures about the hip movements that made Plaintiff uncomfortable.  Maridon Depo. at 236.

At a February 22, 2012 morning meeting, management was giving out awards, and Plaintiff's supervisor indicated that he was taking the group out for lunch the next day.  Maridon Decl. ¶ 24.

1   Two of the male technicians in the group volunteered that they would like to go to Hooters for

2   lunch.  *Id.*

3        On March 29, 2012, Plaintiff was walking through the yard when she passed supervisor Tom

4   Rudy who stated that someone smelled like "ass."  Maridon Decl. ¶ 25.  Plaintiff did not hear to

5   whom Rudy was referring.  *Id.*

6        At a May 23, 2012 technician meeting, Josh Simms, who is either a manager or director at

7   the San Jose FFO was talking to the group about Wi-Fi hotspots around the country.  Maridon Decl.

8   ¶ 26.  In reference to Defendant's competitor Cox Communications, Simms made a comment about

9   being in a "big Cox area," which prompted many of the technicians to laugh and make comments

10  about the "big Cox" joke.  *Id.*; Maridon Depo. at 233-34.

11       At an all technician meeting on June 6, 2012, a technician named Chris was talking about

12  joining a team of "guys" for a company event called Comm Tech Jeopardy.  Maridon Decl. ¶ 27.

13  Eric West asked if girls could join too.  *Id.*

14       During a June 27, 2012 morning technician meeting, technical operations manager was

15  speaking about the upcoming Olympics and women's gymnastics.  Maridon Decl. ¶ 28.  He then

16  made a comment that technical operations manager Jeff Hollington could not stop talking about

17  men's diving.  *Id.*  The men in the room began laughing, and Plaintiff heard someone say that

18  Hollington "must be a faggot."  *Id.*  Hill and Hollington have a history of mocking each other during

19  the technician meetings.  *Id.*

20       At a January 2013 end of the year party, Amy Lynch greeted all of the attendees as

21  "gentlemen" before going on to award prizes and honors.  Maridon Decl. ¶ 29.

22       Plaintiff testified in her deposition that it was not until some time in 2011 that she realized

23  that the company culture that allowed incidents like those described above was not going to change.

24  Maridon Depo. at 131-32.  For some time, she would complain to human resources manager Pam

25  Aldridge, who said she would look into "this whole male bias and goods [sic] old boys' club."  *Id.* at

26  132.  As she took classes in human resources issues, however, she came to the realization that she

27  did not have to put up with a hostile work environment.  Maridon Depo. at 131-32.

28

United States District Court
For the Northern District of California

1    In an interrogatory, Plaintiff also listed nine different supervisors, managers, or other

2 Comcast employees to whom she had complained about harassment in the workplace.  Koepf Decl.

3 Ex. B at 6-7 of 23.  This list included Ralph Martinez (numerous verbal complaints between mid

4 2008 and the end of 2010), Marc Colombo (same), Matt Silvey (two to three verbal complaints in

5 2010), Pam Aldridge (numerous verbal complaints in 2007-2008, and possibly 2009), Jeffery

6 Hollington (two to three verbal complaints in 2011 and 2012), Fred Hinojosa (an unspecified

7 number of verbal complaints in May 2011), Eric West (numerous verbal complaints in 2009-2012),

8 Monica Simon (numerous verbal complaints between 2007 to 2011), and Greg Peters (numerous

9 verbal complaints between 2007 and 2009).  *Id.*

10   B.    Unsuccessful Applications for Supervisor Positions

11    Since the beginning of her employment for Defendant, Plaintiff has indicated interest in

12 promotion within the company.  When she first applied to work for the company, she asked

13 questions about the possibility of advancement, and was led to believe that there could be avenues

14 for advancement in light of her past supervisory experience.  Maridon Decl. ¶ 30.  During her first

15 four years of employment with Defendant, Plaintiff focused on learning as much as she could about

16 installing Comcast products because she wanted to be eligible for promotion.  *Id.* ¶ 31.  One of

17 Plaintiff's early supervisors, Jason Mackintosh, told her that he was thinking of promoting her to

18 lead (a position that the company eliminated in 2004 or 2005).  *Id.* ¶ 32.  He ultimately gave the

19 position to a man, however, and told Plaintiff that it would hurt morale to have her in a lead role

20 because she is a woman.  *Id.*

21    Since 2006, Plaintiff has applied for supervisor positions with Defendant on thirteen different

22 occasions: once in 2005, twice each in 2006 and 2007, three times in 2008, once in 2009, and three

23 times in 2011.  Maridon Decl. ¶ 33.  Two of the positions were in Salinas, one in Santa Clara, and

24 one in Burlingame; the remainder were in San Jose.  *Id.*  For two of the 2011 supervisor positions

25 she is unaware of who was ultimately selected; on all other occasions, the person who was promoted

26 was a man.  *Id.*

27    Prior to 2009, the promotion process required employees to fill out a transfer request form

28 with questions pertaining to why the employee wished to apply for the position, and what they

**United States District Court**
For the Northern District of California

1  brought to the company.  Maridon Decl. ¶ 35.  After filling out the form, Plaintiff was required to

2  give it to her supervisor and someone in human resources for their signatures.  *Id.*  At no point did

3  anyone tell her she was unqualified for a supervisor position.  *Id.*  In response to one of her

4  applications, she received an email telling her that her application had been rejected because she was

5  not qualified.  *Id.* ¶ 36.  When she questioned regional vice president Ralph Martinez and manager

6  Marc Colombo about this, Mr. Martinez assured her that she was qualified.  *Id.*  She was later told

7  that the email was a mistake, though she never received an interview for the position.  *Id.*

8      Each time Plaintiff was not selected, she received feedback about why she was not offered

9  the position.  Maridon Decl. ¶ 37.  She was consistently told that she needed to take more classes

10  and to continue learning more about the Defendant's products.  *Id.*  As a result, she would take

11  additional classes and then re-apply for a supervisory position.  *Id.*  Each time, however, she would

12  receive the same feedback.  *Id.*  Plaintiff also often volunteered to be the first to learn the installation

13  of new products.  *Id.* ¶ 38.

14      After being turned down for several promotions, she asked Human Resources Manager Pam

15  Aldridge for help preparing for an upcoming interview at some point in 2008.  Maridon Decl. ¶ 39;

16  Koepf Decl. Ex. B at 13 of 23.  Aldridge asked Plaintiff mock questions, gave Plaintiff feedback,

17  and worked with Plaintiff to improve her resume.  *Id.*

18      Over time, Plaintiff had experiences that made her discouraged about the possibility of

19  receiving a promotion.  At one unspecified point in time, technician manager David Walton said in a

20  technician's meeting that if you were not someone that he would like to socialize with, you would

21  not be promoted.  Maridon Decl. ¶ 40.  After being turned down for several promotions, she began

22  to realize that most of the promotions came from a group of people who were friends with

23  supervisor John Winn.  *Id.* ¶ 41.  Plaintiff does not indicate when she came to this realization, but

24  provides examples of hiring decisions that fall within this pattern from 2006 and 2008.  *Id.*  This

25  group of technicians generally got preferred schedules and socialized frequently outside of work.  *Id.*

26  Plaintiff has never been invited to any of the group's social activities.  *Id.*

27      In 2007, Plaintiff decided to pursue a college degree in business management, in large part to

28  increase her chances of getting promoted.  Maridon Decl. ¶ 42.  In 2009, Plaintiff received her

United States District Court

For the Northern District of California

associate's degree from the University of Phoenix.  *Id.*  Around that time, she had an interaction with regional vice president Ralph Martinez.  *Id.*  Plaintiff was sitting behind a desk in a vacant office, and Martinez pointed a finger at her and at the desk, and said "that will never happen."  *Id.*  Plaintiff interpreted this to mean that Martinez was telling her that she would never get a desk job. Pl.'s Opp. at 9.  Plaintiff eventually obtained her bachelor's degree in January 2012.  Maridon Decl. ¶ 43.  Plaintiff states that she would not have incurred the expense of pursuing the degree had she not thought it would advance her chances of promotion at Comcast.  *Id.*

As discussed above, Plaintiff had a number of conversations with Pam Aldridge about her concerns over discrimination and harassment in the workplace.  In 2008, Plaintiff complained to Pam Aldridge that she felt Defendant's promotions process was biased.  Maridon Decl. ¶ 48. Aldridge told Plaintiff that she was looking into it, and intended to make some changes to the hiring process.  *Id.*  On July 20, 2008, Plaintiff drafted but did not send an email to Aldridge.  Maridon Decl. Ex. 15; Maridon Depo. at 21-22.  The email thanked Aldridge for her efforts to change the promotions process, and noted "that there is still along [sic] way to go in smashing that glass ceiling."  Maridon Depo. Ex. 15.  Plaintiff noted that her friends, family, and classmates had asked her why she had not yet retained an attorney and brought suit against Defendant for discrimination. *Id.*  Her response was that "that's not who I am and if I did, they would make my life a living hell." *Id.*  She noted that she felt she had been patient and listened to feedback when she initially was not selected for promotion, but that she was becoming increasingly frustrated and felt that she needed "to make a decission [sic] as to whether or not to follow my peers advise [sic] to persue [sic] a discrimination suit, quit school or quit my job."  *Id.*  She stated that she had "worked with all men before and [had] never felt this much anxiety and discrimination from management as I feel here." *Id.*

Sometime in late 2008, Defendant did change its promotions process.  Norwood Decl. ¶ 4. Instead of allowing the individual hiring manager wide discretion in promotions, Defendant implemented a standard screening process.  *Id.* ¶ 3.  Under this process, all internal candidates who met basic qualifications were granted interviews.  *Id.* ¶ 4.  All interviewed candidates were interviewed first by a panel of three technicians, and then by a panel of three supervisors.  *Id.*  Each

United States District Court

For the Northern District of California

1   individual on the panel would provide a separate standard written evaluation for the candidate. *Id.*

2   If the candidate does well on the first two interviews, she or he advances to an interview by a panel

3   of three managers. *Id.* A human resources representative would often sit in on the interviews, and

4   sometimes on the discussions regarding which candidate to select. *Id.* Internal candidates who were

5   not ultimately selected were provided feedback. *Id.* The managers who were a part of the hiring

6   process prior to 2009, including Kevin Perry, Jim Anderson, and Matt Silvey, were not a part of the

7   hiring process after it was changed. *Id.* ¶ 5.

8         Shortly after the changes were implemented, Aldridge was fired in October 2008. Maridon

9   Decl. ¶ 48; Norwood Decl. ¶ 7. Plaintiff initially believed that the changes to the hiring process

10  would address her concerns about bias and improve her chances of receiving a promotion, but she

11  ultimately concluded in 2011 that the changes had not helped. *Id.* ¶ 49.

12        At some point, Aldridge told Plaintiff she should obtain a copy of her personnel file and file

13  a complaint with the EEOC, as Plaintiff was being discriminated against. Koepf Decl. Ex. B at 13 of

14  23. Plaintiff does not recall exactly when this interaction took place, but believes that it was after

15  Aldridge no longer worked for Defendant. Maridon Depo. at 18-20. Plaintiff did not take

16  Aldridge's advice at that time, because she feared retaliation from Defendant if she filed a claim

17  with the EEOC. *Id.*

18        In July 2009, Plaintiff mentioned to a care provider at Kaiser that she had been passed over

19  for promotion four times, and that she believed she was being discriminated against on the basis of

20  her gender. Koepf Decl. ¶ C at Bates 000002. She stated that she did not want to challenge the

21  discrimination because she knew what she "would be in for." *Id.* Later Kaiser records from August

22  2009 indicate that Plaintiff reported that she had been passed over for promotion six times, and that

23  she felt that she was the victim of sex discrimination. *Id.* at Bates 000017. Again, she stated that

24  she felt that it was "not in her best interest to attempt to sue the organization but will continue to try

25  for promotions." *Id.*

26        Sometime in 2009 or 2010, Plaintiff had a meeting with Ralph Martinez and Marc Colombo

27  after receiving an email indicating that she would not be interviewed for one of the supervisor

28

10

United States District Court

For the Northern District of California

1  positions for which she had applied.[2]  Koepf Decl. Ex. B at 16 of 23.  Plaintiff asked what

2  qualifications she was lacking for the position, and Martinez told her that she was qualified.  *Id.*

3  Martinez asked Plaintiff if she felt that she was being discriminated against because she is a woman,

4  and she stated that she did.  *Id.* at 16-17 of 23.  Martinez did not respond to the allegation but stated

5  that the company was revisiting its hiring process.  *Id.* at 17 of 23.  Colombo later responded to

6  Plaintiff telling her she had been confused with an external candidate, even though the email had

7  been sent to Plaintiff's work email address.  *Id.*

8       Shortly after this incident, Plaintiff was contacted by Matt Silvey to write an essay to apply

9  for an emerging leaders program sponsored by Defendant.  Maridon Decl. ¶ 44.  The essays were

10  sent to Livermore for review by the California region vice presidents of technical operations and

11  customer care, and the California senior director of human resources.  *Id.*  Plaintiff was told multiple

12  times that participants who completed the program would receive an edge in applying for future

13  promotions.  *Id.*

14       In 2011, Plaintiff was told that it was important to volunteer for special projects if she

15  wanted to be promoted.  Maridon Decl. ¶ 45.  Plaintiff has been volunteering for special projects for

16  years, but she has never been selected to work on one.  *Id.*

17       For the first twelve promotion application processes, Plaintiff was never interviewed by a

18  woman, with the exception of human resources representatives who would sometimes sit in but not

19  participate in the interview.  Maridon Decl. ¶ 46.  In the thirteenth interview, another female

20  technician from Scott's Valley was part of the interview panel.  *Id.*

21       After Plaintiff's final two interviews for promotions at the San Jose office (her eleventh and

22  twelfth applications), Jeff Hollington and a human resources representative named Fred told Plaintiff

23  that she "made the interview too much about" her and told her that she perhaps did not fit the culture

24  of the company.  Maridon Decl. ¶ 47.  Fred suggested she look for a position outside of Comcast.

25  *Id.*  Though Plaintiff does not identify a specific date for this conversation, she applied for the

26  ─────────────────

27       [2]  The timeline here is inconsistent.  In her declaration attached to her opposition, Plaintiff
    states that this incident occurred in October 2010.  Maridon Decl. ¶ 44.  In her response to an earlier
28  interrogatory, however, Plaintiff stated that this incident occurred in late 2009.  Koepf Decl. Ex. B at
    16-17 of 23.

United States District Court

For the Northern District of California

1  positions in question in February and March of 2011, suggesting that the conversation occurred in

2  early to mid-2011.  Koepf Decl. Ex. B at 4-5 of 23.

3      Plaintiff states that it was not until after she was interviewed but not selected for the last

4  three promotions in 2011 that she came to the conclusion that she would never be promoted.

5  Maridon Decl. ¶ 50.  Until that point, she had hoped that the changes to the hiring process, her

6  pursuit of a college degree, and her participation in the emerging leaders program would result in her

7  being selected for a supervisor position.  *Id.* ¶¶ 49-50.  Shortly after she came to this realization, she

8  filed her charge with the EEOC.  Maridon Depo. at 147.

9  C.   <u>Filing EEOC Charges</u>

10     Plaintiff filed an initial EEOC claim on June 3, 2011.  Koepf Decl. Ex. D at 6 of 18.  In this

11  original complaint, she wrote:

12          I have applied for a supervisor position at least 8 times in the 10 years
           I have been employed at Comcast and have always been denied the
13          position for nonsubstantial reasons.  My work, attendance, and
           performance are better than those who have gotten the positions in the
14          past and present.

15  *Id.* at 7 of 18.  The original claim did not mention workplace harassment.

16     On November 30, 2011, she submitted to the EEOC an amended charge that included

17  allegations that she had been subjected to a hostile working environment on the basis of sex and

18  sexual orientation.[3]  Koepf Decl. Ex. D at 11-17 of 18; Compl. ¶ 14.

19              **III.   DISCUSSION**

20     Summary judgment is proper where the pleadings, discovery and affidavits show that there is

21  "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

22  law."  Fed. R. Civ. P. 56(a).  The Court will grant summary judgment "against a party who fails to

23  make a showing sufficient to establish the existence of an element essential to that party's case, and

24  on which that party will bear the burden of proof at trial . . . since a complete failure of proof

25  concerning an essential element of the nonmoving party's case necessarily renders all other facts

---

26

27      [3]  Defendant states that the amended charge was filed on November 30, 2011, but the
attached exhibits contain nothing bearing that date.  *See* Koepf Decl. Ex. D.  The parties do not
28  appear to dispute this date, however; the Complaint also alleges that the amended charge was filed
on November 30, 2011.  Compl. ¶ 14.

**United States District Court**

For the Northern District of California

immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")  The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (citations omitted.)  The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at 631.

A.      Continuing Violation Doctrine

With certain exceptions not applicable here, California's Fair Employment and Housing Act requires that employees file an administrative complaint within one year of the allegedly discriminatory or harassing conduct.  Cal. Gov. Code § 12960(d) ("No complaint may be filed after the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred . . . ."); *see also Richards v. CH2M Hill, Inc*., 26 Cal. 4th 798, 811–12 (2001).  Thus, incidents occurring more than one year prior to the filing of the administrative claim are untimely unless the continuing violation doctrine applies.  *See Cucuzza v. City of Santa Clara*, 104 Cal. App. 4th 1031, 1040 (2002).  Here, the limitations period, at least for denials of promotion, reaches back to June 3, 2010, one year before she filed her EEOC claim.

Under the continuing violation doctrine, "an employer is liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct that occurred within the limitations period."  *Yanowitz v. L'Oreal USA, Inc*., 36 Cal. 4th 1028, 1056 (2005).  In *Richards*, the California Supreme Court established a three point test:

the continuing violation doctrine applies when an employer's unlawful acts are:

- • sufficiently similar in kind;

- • have occurred with reasonable frequency; and

- • have not acquired a degree of permanence.

*Richards*, 26 Cal. 4th at 823.  Thus, a continuing violation may exist where there is a company-wide policy or practice of discrimination, or a series of related acts against a single individual.  *Morgan v. Regents of the Univ. of Cal.*, 88 Cal. App. 4th 52, 64 (2000).  The continuing violation doctrine is justified on the grounds that:

> [a] rule that would force employees to bring actions for 'discrete acts' of retaliation that have not yet become ripe for adjudication, and that the employee may not yet recognize as part of a pattern of retaliation, is fundamentally incompatible with the twin policy goals of encouraging informal resolution of disputes and avoiding premature lawsuits.

*Yanowitz*, 36 Cal. 4th at 1058.

In *Richards*, the plaintiff sued for disability discrimination, harassment, and failure to reasonably accommodate her disability.  26 Cal. 4th at 802.  Although the alleged adverse actions occurred over the course of five years, the court found that the continuing violation doctrine applied because the defendant's failure to reasonably accommodate the plaintiff's disability was part of a single course of conduct.  *Id.* at 819.  Thus, "[a]s with harassment, an instance of an employer's failure to accommodate that in isolation may seem trivial can assume greater significance and constitute a greater injury when viewed as one of a series of such failures."  *Id.* at 822.  Furthermore, the court found that reasonable accommodation was often an ongoing process rather than a single decision.  *Id.* at 821.  Requiring the plaintiff to sue for each discrete failure to accommodate would prevent the plaintiff from engaging in an interactive process with her employer in the hope that the parties would come to an informal resolution.  *Id.* at 823.  Once an employer makes clear that it will not accommodate the employee – making the condition 'permanent' – the employee no longer has a reason to delay, and will be required to take formal legal action.  *Id.*

Likewise, in *Yanowitz*, the California Supreme Court found that the plaintiff's claims were not time-barred as a matter of law. 36 Cal. 4th at 1060. There, the plaintiff was a regional sales manager who refused to fire a female sales associate in 1997 that the general manager deemed was not attractive enough. *Id.* at 1038. Beginning in April 1998, the general manager began to solicit negative comments about the plaintiff from her subordinates, frequently criticized her management style, and refused to allow her to answer these charges during a July 1998 meeting, ultimately resulting in her departure. *Id.* at 1039–40. Although the plaintiff did not file her complaint with DFEH until June 1999, the court found that the continuing violation doctrine could apply to impose liability for actions that occurred prior to June 1998 because the plaintiff alleged a course of conduct in which the defendant solicited or fabricated negative information, and then used this information to intimidate, disempower, and punish the plaintiff. *Id.* at 1059. The court found that a reasonable trier of fact could find that the plaintiff "was not on notice that further conciliatory efforts would be futile, until her final attempts to meet with company representatives to discuss the criticism directed at her were finally rebuffed." *Id.*

In contrast, the court in *Morgan* found that the continuing violation doctrine did not apply to the plaintiff's retaliation claim. 88 Cal. App. 4th at 67. There, the plaintiff alleged that he was laid off after filing a grievance claiming racial discrimination. *Id.* at 57–58. After being laid off, the plaintiff applied for thirty-two jobs with the University between 1995 and 1996, but was not hired despite having preference for employment on the campus. *Id.* at 57–58. The plaintiff then filed a complaint with DFEH in April 1997, alleging that he was denied employment and rehire rights in retaliation for filing a grievance. *Id.* at 62. The court found that the continuing violation doctrine did not apply because the unlawful acts were insufficiently similar in kind, as the plaintiff had not alleged a University-wide policy of discrimination or that the individual hiring decisions were related. *Id.* at 65. Instead, the hiring decisions were isolated employment decisions "made by different decision makers in unrelated departments of the University regarding positions with varying job requirements." *Id.* Furthermore, the court found that "each time appellant was informed he was not being hired for a position to which he had applied, he was, or should have been, aware

United States District Court

For the Northern District of California

this action might be contrary to his preferential rehire rights." *Id.* at 67.  Thus, each rejection "had the degree of permanence which should trigger an employee's awareness of and duty to assert his . . . rights." *Id.* at 66.

The parties dispute who has the burden of proof on the applicability of the continuing violations doctrine.  The parties agree that no California case has to date provided a detailed analysis of who bears the burden of proof on this issue.  Pl.'s Opp. at 13; Def.'s Reply at 3.  Plaintiff points to the CACI instructions on the issue of continuing violation, the notes to which state that "[n]o case directly addresses which party has the burden of proof regarding the continuing-violation doctrine," and suggests that since the doctrine concerns the application of the statute of limitations, Defendant should bear the burden.  Pl.'s Mot. at 13.  Defendant points to a number of cases that, while not explicitly analyzing burden of proof, contain language suggesting that a plaintiff bears the burden. In *Cucuzza v. City of Santa Clara*, for example, the court stated that "[i]n applying the Richards test to the instant case we conclude that *plaintiff did not demonstrate* a triable issue of fact relating to City's statute of limitations defense."  104 Cal. App. 4th 1031 (2002) (emphasis added); *see also Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 64 (2000) ("*a plaintiff who shows* that a policy and practice operated at least in part within the limitation period satisfies the filing requirements") (emphasis added).  Similarly, the court in *Gardner v. City of Berkeley*, found that the continuing violations doctrine did not apply because "*[p]laintiff cannot demonstrate* that the events had not acquired a 'degree of permanence.'"  838 F. Supp. 2d 910, 920 (N.D. Cal. 2012) (emphasis added).  Plaintiff in the case at bar points to no decisions containing language suggesting that the defendant bears the burden on this issue.  This Court thus concludes that Plaintiff bears the burden on this issue.

B.      Timeliness of Discrimination Claims

Defendant contends that Plaintiff's claims for discriminatory failure to promote her do not fall within the continuing violations theory because each promotion process was a discrete, unrelated event, and because each promotion decision reached a state of permanence once it was made. Plaintiff counters that the different failure to promote occurrences do fall within the continuing

violations doctrine because (1) they were part of a pattern or practice of discrimination against women;[4] and (2) they were not isolated and sporadic events.  Pl.'s Opp. at 13-19.

Although her brief is not entirely clear on this point, it appears that Plaintiff is arguing that she can establish a continuing violation by showing that Defendant's failure to promote her was part of a pattern and practice of sex discrimination, regardless of whether she can demonstrate a continuing violation under the three part test in *Richards*.  She cites extensively to *Morgan*, which noted two other cases that had found that challenges to promotional decisions to be timely under the continuing violations theory.  88 Cal. App. 4th at 64 (citing *Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 924 (9th Cir. 1982)[5] and *City & County of San Francisco v. Fair Employment & Hous. Com.*, 191 Cal. App. 3d 976, 980 (Ct. App. 1987)).  In *Richards* the California Supreme Court acknowledged both of these cases in its survey of different approaches to the continuing violations doctrine, but *declined* to follow the continuing violations rule articulated in those cases.  *Richards*, 26 Cal. 4th at 813.  Hence, the cases cited by Plaintiff are questionable vitality after *Richards*.

At least one post-*Richards* case, however, has acknowledged that pattern and practice allegations may be sufficient to establish a continuing violation independent of the test articulated in *Richards*, but under circumstances that are not applicable here.  *Alch v. Superior Court*, 122 Cal. App. 4th 339, 367-77 (2004).  In *Alch*, the court found that the *Richards* test was inapplicable to a pattern and practice claim brought by the plaintiff class alleging that they had not been hired because of a policy and practice of refusing to give work to older television writers.  *Id.* at 350.  The court found that the three part test articulated in *Richards* was inapplicable to the factual context where the plaintiffs were alleging an ongoing system of discrimination that resulted in them not being hired.

---

[4]  Defendant objects to Plaintiff's pattern and practice arguments, arguing that she failed to plead a pattern and practice claim in her complaint, and that the statistics upon which she bases her argument are insufficiently reliable.  Since the Court concludes that Plaintiff's pattern and practice argument does not help her on this motion, the Court does not reach these issues.

[5]  The Supreme Court has since overturned *Williams*, holding that under Title VII, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  This is not dispositive in this analysis, however, because while California courts have at times looked to Title VII jurisprudence in interpreting FEHA, they have other times declined to follow the rulings of federal courts interpreting Title VII.  *See Richards*, 26 Cal. 4th at 812-24.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    *Id.* at 370.  Under *Alch*, where a claim "seeks relief for discrimination during the limitations period"

2    for "pervasive companywide discrimination against a protected class," the *Richards* test does not

3    apply.  *Id.*  *Richards* is inapplicable where "no test is necessary to determine whether unlawful

4    actions outside the limitations period should be viewed as part of a single, actionable course of

5    conduct, because no relief is sought for actions outside the limitations period.  Relief is sought only

6    for enforcement of the discriminatory policy during the limitations period." *Id.* at 375.

7         *Alch* is inapplicable here.  Plaintiff seeks to establish Defendant's liability for specific

8    instances of non-promotion *outside* the limitations period; and there is no claim of pervasive

9    discrimination against a protected class.  Thus, the *Richards* test applies.

10        Plaintiff fails to satisfy the continuing violations test in *Richards* because the challenged

11   promotions decisions had acquired a degree of permanence.  *See Richards*, 26 Cal. 4th at 823.  As in

12   *Morgan*, Plaintiff's allegations concern a number of specific job applications where she was

13   considered and rejected for promotion.  Though Plaintiff may be able to raise factual issues about

14   the similarity of the hiring process on the various occasions, and her applications and subsequent

15   rejections occurred with relative frequency, each decision was discrete and permanent when made.

16   In *Morgan*, the court found that "each time appellant was informed he was not being hired for a

17   position to which he had applied, he was, or should have been, aware this action might be contrary

18   to his preferential rehire rights." *Morgan*, 88 Cal. App. 4th at 67.  Plaintiff offers no argument

19   distinguishing this case from the facts in *Morgan* on this point.  *See* Pl.'s Opp. at 18-19.

20        Plaintiff offers testimony indicating that she continued to hope that her efforts at improving

21   her skills and education, and Defendant's changes in hiring policy would result in her eventually

22   securing a promotion.  *See, e.g.*, Maridon Decl. ¶¶ 49-50.  The fact that Plaintiff was not convinced

23   until sometime in 2011 that Defendant would *never* promote her, however, does not mean that her

24   failure to secure past promotions in a number of specific, discrete instances was not final.  In an

25   analogous case, this Court found that the continuing violations doctrine was inapplicable where the

26   defendant had forced the plaintiff to retire, and then declined on several distinct occasions to rehire

27   him.  *Gardner v. City of Berkeley*, 838 F. Supp. 2d 910, 920 (N.D. Cal. 2012).  In that case, this

28   Court found that

1
2
3

> Each event involved a final decision to either retire or not reinstate
> Plaintiff, with no opportunity for further discussion. While Plaintiff
> argues that the decision not to rehire or reinstate Plaintiff was not
> permanent in the sense that BPD could still hire Plaintiff in the future,
> a final decision was still made to not hire Plaintiff *at that time.*

4  *Id.* (emphasis in original).

5       Further, it appears that Plaintiff had indications from as early as 2004 or 2005 that her gender

6  may be a factor in Defendant's decisions not to promote her.  Around that time, her supervisor Jason

7  Mackintosh told her that he had considered promoting her to lead, but that he ultimately did not do

8  so because he was concerned that it would hurt morale to have a woman in that position.  Maridon

9  Decl. ¶ 32.  Over time, she had other experiences that indicated to her that her gender may have been

10  a factor in Defendant's promotional decisions, and by mid-2008 at which point she had been turned

11  down for several positions, she had explicitly considered the possibility of suing for sex

12  discrimination.  *See* Maridon Depo.  Ex. 15 (unsent email to Aldridge).  At some point in 2009, she

13  had an interaction with regional vice president Ralph Martinez where he indicated to her that she

14  would never be promoted.  Maridon Decl. ¶ 42.  Although Defendant changed its promotional

15  process in 2008, Aldridge, with whom Plaintiff had communicated about her perception of

16  discrimination, was fired in October 2008.  Maridon Decl. ¶ 48; Norwood Decl. ¶ 7.  In July 2009,

17  Plaintiff told a case provider at Kaiser that she believed she had been discriminated against on the

18  basis of gender but decided not to sue at that time.  Koepf Decl. Ex. C.  Plaintiff was thus well aware

19  prior to the limitations period (which commenced on June 3, 2010) that Defendant's failure to

20  promote her may have been discriminatory.

21       As each of the instances where Plaintiff was not promoted was discrete and permanent,

22  Plaintiff is unable to establish a continuing violation with regards to her claims for Defendant's

23  allegedly discriminatory failure to promote her.  Her claims are thus time barred with respect to all

24  instances where she was denied promotion prior to June 3, 2010.[6]

25
26

_____

27       [6] The fact that Plaintiff may not recover damages for these incidents, however, does not
necessarily mean that evidence of those incidents is not admissible where it is relevant to her
28  remaining claims.  *See Gardner*, 838 F. Supp. 2d at 921.

19

United States District Court

For the Northern District of California

C.       Timeliness of Harassment Claims

    1.       Application of Continuing Violation Doctrine

Defendant argues that Plaintiff's harassment claims also do not fall within the continuing violations doctrine because the incidents of harassment are not sufficiently similar in kind, they did not occur with reasonable frequency, and they had acquired a degree of permanence because Plaintiff should reasonably have known that further efforts to address the harassment would be futile. Def.'s Mot. at 15-17. This Court finds that, as with the discrimination claims, Plaintiff's harassment claims do not come within the continuing violations doctrine, because even if they were similar in kind, they had reached a level of permanence before the commencement of the limitations period in 2010. As the facts above demonstrate, by 2009 it was clear that relief from Comcast would not be forthcoming and that any effort short of a lawsuit would be futile.

The evidence in the record shows that during her time with Comcast, Plaintiff complained to various supervisors and human resources managers about what she felt was a culture of male bias and harassment. For example, as early as 2007, she was complaining to Pam Aldridge, Monica Simon, and Greg Peters. Koepf Decl. Ex. B at 6-7 of 23. She continued to complain to various supervisors and managers about harassment throughout 2008, 2009, 2010, and 2011. *Id.* Unlike with the discrimination claims where Defendant was providing Plaintiff with a number of indications that it might address her concerns about bias in the hiring process, there are only a few, relatively minor, indications that Defendant ever took any meaningful steps to address Plaintiff's concerns about workplace harassment. For example, Plaintiff indicates that she was told that Pam Aldridge required sexual harassment training for some employees after they made inappropriate comments about female trainer. *See* Maridon Depo. at 227-29. Plaintiff does not provide a date for this incident, but it would have occurred prior to Aldridge's termination in October 2008. Norwood Decl. ¶ 7. Plaintiff also relates one incident where supervisor Matt Silvey said he would speak to another employee who had made a comment Plaintiff felt was disrespectful. Maridon Depo. at 55-59. Again, Plaintiff does not indicate the date of this incident, and she provides no indication that there was any further follow up from Silvey. Other than this incident with Silvey and Plaintiff's conversations with Aldridge, there is no indication in the record that anyone in a position of

United States District Court

For the Northern District of California

1   authority at Comcast took any meaningful steps prior to 2010 to address Plaintiff's complaints about

2   harassment in the workplace.

3        In contrast to these few occasions where there was some indication that Defendant's

4   supervisors or managers might take action to address the workplace harassment, there were also

5   incidents where supervisors did nothing, or were part of the harassing conduct.  It was a supervisor

6   who told Plaintiff in late 2008 or early 2009 that she should wear a cowbell around her neck when

7   she was near the supervisors' offices.  Maridon Decl.  13.  She also reported hearing supervisors use

8   vulgar or sexist language on various occasions.  Maridon Depo. at 93-95, 126-27, 136-37; Maridon

9   Decl. ¶ 6, 15, 18-19.  At other times, supervisors would not intervene when others were making

10  sexist or inappropriate comments in their presence.  Maridon Depo. at 55-59.  The fact that these

11  authority figures were not only failing to address harassment, but were also participating in the

12  offensive conduct would have given any reasonable employee concern about whether informal

13  efforts to end the harassment would be fruitful.

14        The only serious indications that Plaintiff seemed to have gotten from anyone in a position of

15  authority that Defendant might take steps to address the harassment came in the form of her

16  conversations with Pam Aldridge.  Though these conversations often focused on Plaintiff's efforts to

17  be selected for promotion, Plaintiff also raised concerns to Aldridge about her perceptions of gender

18  bias and a "good old boys club."  Maridon Depo. at 131-32.  Aldridge told Plaintiff that she would

19  look into her concerns.  *Id.*  Particularly given Aldridge's successful efforts to make changes to the

20  promotions process, Plaintiff may well have had reason to believe that Aldridge might be able to

21  make headway on issues of harassment in the workplace.  After Aldridge was terminated in October

22  2008, however, it would appear that there was little remaining cause for optimism that Defendant

23  would take the steps necessary to prevent further harassing conduct.

24        Even if Plaintiff did not draw the conclusion – implied in her brief – that Aldridge may have

25  been fired precisely because of her efforts to address gender bias within the company, Aldridge's

26  firing at the least indicates that the only individual who had shown significant interest in addressing

27  Plaintiff's concerns was no longer able to offer her help.  The only incident Plaintiff identifies from

28  before 2010 where a supervisor or manager other than Aldridge gave any indication that her

United States District Court

For the Northern District of California

1   concerns would be addressed was the incident where Matt Silvey told her that he would speak to a

2   supervisor who had failed to intervene when someone was making comments Plaintiff felt were

3   inappropriate.  Given the apparent lack of follow up after this conversation, a reasonable employee

4   in Plaintiff's position would not have concluded from this interaction that Defendant was taking

5   serious steps to address her workplace harassment concerns.

6          Thus, as of the time Pam Aldridge left Comcast in 2008, no other person in a position of

7   authority had taken meaningful steps to address Plaintiffs concerns, or had indicated to her that they

8   would do so.  As discussed above, Plaintiff had by this time explicitly considered suing Defendant

9   for discrimination.  Though much of her consideration appears to have focused on Defendant's

10  failure to promote her, in her un-sent email to Pam Aldridge from July 2008, she mentioned her

11  feeling that Defendant ran a "male dominated good ol' boy business," and stated that though she had

12  "worked with all men before," she had "never felt this much anxiety and discrimination from

13  management as I feel here."  Maridon Depo. Ex. 15.  Even if conversations with Aldridge were

14  sufficient to indicate to Plaintiff that there was the possibility of improvement, once Aldridge was

15  gone, a reasonable employee would have concluded that Defendant was unlikely to take any steps to

16  effectively address her complaints of harassment.  In light of Defendant's silence and inaction in the

17  face Plaintiff's numerous complaints, and the unabated continuation of the harassing behavior, it

18  would have been clear to a reasonable employee that attempts at informal conciliation were unlikely

19  to provide meaningful relief from the harassment.  *See Richards*, 26 Cal. 4th at 823.  Moreover, prior

20  to June, 2010, Aldridge had advised Plaintiff to obtain her file and file an EEOC complaint.  Koepf

21  Decl. Ex. B at 13 of 23.  Even giving Plaintiff the benefit of six months after Aldridge's departure

22  before it was reasonable to conclude that no other manager or human resources staffer would take up

23  the effort to address her concerns, Plaintiff's harassment claims would have achieved a state of

24  permanence well before mid-2010.[7]

25  _____

26      [7] Plaintiff does provide one example of a supervisor indicating that he would take action
    after 2009.  She relates an incident in 2011 where a technician was talking about a female
27  customer's breasts in front of a supervisor, and the supervisor failed to intervene until Plaintiff
    prompted him to do so.  Maridon Decl. ¶ 20.  Plaintiff complained to Matt Silvey about the
28  supervisor's lack of responsiveness, and he indicated that he would look into the matter.  Maridon
    Depo. at 136-37.  There is no indication in the record, however, Silvey took any further action.  In

United States District Court

For the Northern District of California

1    Plaintiff also argues that a jury could find that the harassment had not yet reached a state of

2  permanence based on her testimony that she did not come to the conclusion that the situation would

3  never change until some time in 2011.  Pl.'s Opp. at 21; Maridon Depo. at 131-32.  Plaintiff's

4  subjective belief in this regard do not control.  The standard for permanence under *Richards* is

5  *objective* rather than subjective.  *Richards*, 26 Cal. 4th at 823.  Thus "[w]hen the hope that

6  conditions will improve or that informal conciliation may succeed is unreasonable, . . . justification

7  for delay in taking formal legal action no longer exists" and the continuing violation doctrine is

8  inapplicable.  *Id.*  For the reasons discussed above, the Court finds that at some point prior to mid

9  2010, it was unreasonable to believe that informal conciliation efforts would address and stop the

10  alleged pervasive and prolonged workplace harassment Plaintiff suffered.  The Court finds that the

11  continuing violation doctrine is inapplicable to Plaintiff's harassment claims which occurred outside

12  the limitations period.

13    2.    Relation Back of Harassment Claims to Initial EEOC Claim

14    The parties also dispute whether the statute of limitations on the harassment claim should run

15  from Plaintiff's original or amended EEOC complaint (June 3, 2010, instead of November 8, 2010).

16  *See* Pl.'s Opp. at 21; Def.'s Reply at 13.  The Ninth Circuit has held that "[i]ncidents of

17  discrimination not included in an EEOC charge" are not considered under that charge "unless the

18  new claims are 'like or reasonably related to the allegations contained in the EEOC charge."  *Green*

19  *v. Los Angeles Cnty. Superintendent of Sch.*, 883 F.2d 1472, 1476 (9th Cir. 1989) (quoting *Brown v.*

20  *Puget Sound Elec. Apprenticeship & Training Trust*, 732 F.2d 726, 729 (9th Cir.1984)).  "In

21  determining whether an allegation under Title VII is like or reasonably related to allegations

22  contained in a previous EEOC charge, the court inquires whether the original EEOC investigation

23  would have encompassed the additional charges."  *Id.*  The court may also "consider such factors as

24  the alleged basis of the discrimination, dates of discriminatory acts specified within the charge,

25  perpetrators of discrimination named in the charge, and any locations at which discrimination is

26

27
28  light of Defendant's general failure to take any meaningful action to address the harassment, this one
     statement, without more, would not lead a reasonable employee to conclude that there was still a
     meaningful chance of informal reconciliation.

**United States District Court**

For the Northern District of California

alleged to have occurred." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002). "In addition, the court should consider plaintiff's civil claims to be reasonably related to allegations in the charge to the extent that those claims are consistent with the plaintiff's original theory of the case." *Id.* The Ninth Circuit has held, however, that "EEOC charges must be construed with utmost liberality since they are made by those unschooled in the technicalities of formal pleading." *Kaplan v. Int'l Alliance of Theatrical & Stage Emp. & Motion Picture Mach. Operators of U.S. & Canada*, 525 F.2d 1354, 1359 (9th Cir. 1975), *abrogated on other grounds by Laughon v. Int'l Alliance of Theatrical Stage Employees*, 248 F.3d 931 (9th Cir.2001).

Plaintiff correctly notes that there was no check box for harassment claims on the EEOC form she filled out for her original claim. Koepf Decl. Ex. D at Bates 0158. She did include a narrative description of her complaint, however, which reads, in relevant part:

> I had applied eight times within the last 10 years for a supervisory position. The last job application I submitted was in March 2011. There were three supervisory positions open and all males were selected. I believe I was the best qualified candidate for the position. I believe I was discriminated against because of sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

*Id.* Plaintiff was unrepresented at the time that she filed the charge, and had no assistance or advice in filing the charge. Maridon Decl. ¶ 50.

Courts in this district considering whether discrimination charges necessarily encompass subsequently raised harassment claims have reached different results. In *Pacanza v. Shell Oil Co.*, the court found that the plaintiff's harassment claim related back to an EEOC charge which had claimed only discriminatory termination because there were largely overlapping factual allegations that formed the basis for both claims. C-96-0167 WDB, 1997 WL 227980 (N.D. Cal. Mar. 19, 1997). The court held that "as a matter of law, plaintiff has exhausted his administrative remedies with respect to his harassment claim because that claim would have been uncovered in an investigation of his discrimination charge." *Id. See also Thompson v. Walgreen Co.*, C-05-2348 MMC, 2005 WL 1562791 (N.D. Cal. June 24, 2005) (finding that there was a good faith argument that the plaintiff's harassment claims related back to her disparate treatment failure to promote charge). On the other hand, the court in *Barron v. United Air Lines, Inc.*, C 92 1364 BAC, 1993

United States District Court

For the Northern District of California

WL 140630 (N.D. Cal. Apr. 20, 1993) found that the plaintiff's harassment claims did not relate back to his charge of discrimination alleging discriminatory denial of promotion. The court there found that the plaintiff's administrative charge "did not mention (or even imply) that he was harassed on the basis of his race," and that "[t]herefore, the scope of the administrative investigation into Barron's Charge of Discrimination would not reasonably have included an investigation into claims of harassment within the Cabin Equipment Department." *Id.*

This Court finds that under the circumstances here, Plaintiff's harassment claims relate back to her original administrative charge because an investigation based on the charge would likely have uncovered the workplace harassment. The discriminatory failure to promote and harassment claims date from the same period of time, and involve many of the same individuals. *See* Koepf Decl. Ex. B at 6-7 of 23 (Plaintiff reported harassment to Ralph Martinez, Marc Colombo, Matt Silvey, Pam Aldridge, and others); Norwood Decl. ¶ 5 (Silvey involved in pre-2009 hiring); Koepf Decl. Ex. B at 16 of 23 (Colombo and Martinez involved in hiring, Plaintiff told Martinez she felt she was being discriminated against); Maridon Decl. ¶ 43 (Martinez told Plaintiff she would never get a desk job); Maridon Decl. ¶ 39, 48; Koepf Decl. Ex. B at 13 of 23 (Plaintiff spoke with Aldridge regarding concerns of discrimination in the promotions process, Aldridge initiated changes in promotions process). Indeed, Plaintiff's allegations suggest that many, if not most, of the decision-makers for Defendant's promotions process were also aware of the workplace harassment and failed to take action to address Plaintiff's concerns. Plaintiff's allegations regarding the discrimination and harassment claims are distinct in some ways, but share an overarching concern with a "good old boys' club" workplace culture where Plaintiff, as the sole woman in her division, was made to feel unwelcome and discouraged from seeking leadership roles. Given Plaintiff's allegations about the long standing and pervasive nature of the harassment, and the overlap in key witnesses, this Court finds that an EEOC investigation based on Plaintiff's original administrative charge would reasonably have encompassed the harassment allegations. This is particularly so because the claims of intentional discrimination in denial of promotion would naturally entail an inquiry into the intent and attitude of the involved decision-makers – their participating in or handling of incidents of gender-based harassment would thus be a natural subject of the investigation. A liberal reading of

Plaintiff's original charge is particularly justified given that she was unrepresented at the time she filed the charge. *See Kaplan*, 525 F.2d at 1359.

The Court thus concludes that Plaintiff's harassment claims relate back to her originally filed EEOC claim. In order to be timely, therefore, any claims of harassment must be based on incidents that occurred on or after June 3, 2010.

## IV.   CONCLUSION

For the forgoing reasons, this Court finds that Plaintiff's claims of discrimination and harassment based on events prior to June 3, 2010 are untimely. Therefore, Defendant's motion for partial summary judgment is **GRANTED** in part. As this Court concludes that Plaintiff's harassment claims relate back to her originally filed administrative charge, Defendant's motion is **DENIED** in part.

This order disposes of Docket No. 26.


IT IS SO ORDERED.


Dated:  April 25, 2013

_____
EDWARD M. CHEN
United States District Judge